USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/10/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
COLONIAL OIL INDUSTRIES, INC.,

               Plaintiff,

     v.                              11 Civ. 5018 (DAB)
                                      MEMORANDUM AND
                                         ORDER

INDIAN HARBOR INSURANCE CO.,

               Defendant.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.


    This matter is now before the Court on Parties' cross-Motions for Judgment on the Pleadings.  For reasons that follow, Plaintiff's Motion is DENIED, Defendant's Motion is GRANTED, and the Complaint is DISMISSED in its entirety and on the merits.


I. BACKGROUND

    The following facts, except where noted, are drawn from the Complaint and are undisputed for present purposes.

    Plaintiff, a corporation in the business of storing, selling, and delivering petrochemicals, including fuel oil, brings suit against Defendant, its insurer, seeking coverage under a Pollution and Remediation Legal Liability Insurance Policy (the "Policy").  Plaintiff alleges that it purchased fuel oil from a third party, P&W, which delivered it to Plaintiff's Tank 127 through 25 separate tanker truck deliveries over the course of two weeks. (Compl. Ex. C at 4.)  Unbeknownst to Plaintiff, the oil delivered by P&W was contaminated with PCBs. (Compl. ¶ 25.)

Before it received the results of contamination tests it had conducted on the oil delivered by P&W, Plaintiff sold and distributed some of the oil from Tank 127 to its customer, International Paper ("IP").  (Compl. ¶ 24.)

After Plaintiff discovered that the oil in Tank 127 (and the oil delivered from Tank 127 to IP) was contaminated with PCBs, it made two demands for coverage from Defendant under the Policy. The first is for property damage incurred by IP at IP's site, including the lost value of the fuel oil which was contaminated by the PCB-laden oil delivered by Plaintiff and the costs incurred by IP in removing the contaminated oil from its tanks and pipes.  (Compl. Ex. D at 2.) The second claim is for coverage for costs and expenses connected with the oil remaining in Tank 127, including possible remediation as required by the EPA. (E.g. Compl. ¶ 1.)

By letter dated February 8, 2010, Defendant declined to provide Policy coverage for either of Plaintiff's demands. (See Compl. Ex. E.)  Defendant provided two reasons for its decision: (1) that the matter "does not involve a pollution condition"; and (2) that the matter "does not involve a pollution condition on, at, under or migrating from a covered location."  (Id. at 2.)

Plaintiff brought this suit for breach of contract in due course, asserting that Defendant has breached the insurance contract by refusing to defend IP's claim against Plaintiff, by refusing to indemnify Plaintiff for the damages suffered by IP, and by refusing to indemnify Plaintiff for the costs it has

2

incurred or will incur remediating the contamination of Tank 127 and associated pipes at Plaintiff's facility.

Defendant timely moved for judgment on the pleadings on the theory, among others, that the Policy does not provide coverage under these circumstances, since no pollution condition has occurred.[1] Plaintiff cross-moved on the pleadings for a judgment of liability.

Parties agree that construction of the Policy is governed by New York law, and Parties further agree that Defendant is not obligated to provide coverage unless the contamination, at either site, constitutes or arises from a Pollution Condition as defined by the Policy.  Under the Policy,

> POLLUTION CONDITION means:
>
> 1.   the discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS into or upon land, or structures thereupon, the atmosphere, or any watercourse or body of water including groundwater; [or]
>
> 2.   the presence of any uncontrolled or uncontained POLLUTANTS into land, the atmosphere, or any watercourse or body of water including groundwater . . .

Policy, §II, ¶R.

The Parties agree, and the Court assumes without deciding, that PCB-contaminated fuel oil is a Pollutant as defined by the Policy.

---

[1]The Complaint being subject to dismissal on this theory, the Court needs not reach and does not reach Defendant's remaining arguments for dismissal.

## II. LEGAL STANDARDS

### A. Judgment on the Pleadings

Faced with a Rule 12(c) motion for judgment on the pleadings, a court applies the familiar standard applicable to a motion brought pursuant to Rule 12(b)(6). <u>Hayden v. Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2010) (citations omitted).

For a complaint to survive a Rule 12 motion, the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'

<u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556-57). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated,

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth.  While legal conclusions can
provide the framework of a complaint, they must be
supported by factual allegations.  When there are
well-pleaded factual allegations, a court should assume
their veracity and then determine whether they
plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

In considering a Motion under Rule 12, the Court must accept
as true all factual allegations set forth in the complaint and
draw all reasonable inferences in favor of the plaintiff. See
Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n. 1 (2002); Blue
Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts
Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).  However, this
principle is "inapplicable to legal conclusions," Iqbal, 129 S.
Ct. at 1949, which, like the complaint's "labels and
conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor
should a court "accept [as] true a legal conclusion couched as a
factual allegation." Id. at 555.

On a 12(c) motion for judgment on the pleadings, the court
considers "the complaint, the answer, any written documents
attached to them, and any matter of which the court can take
judicial notice for the factual background of the case." Roberts
v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009).


B. Contract Interpretation

Under New York law, the starting point of contract
construction is the contract's plain language. "The cardinal
principle for the construction and interpretation of insurance

5

contracts . . . is that the intentions of the parties should
control . . . [and] the meaning of particular language found in
insurance policies should be examined in light of the business
purposes sought to be achieved by the parties and the plain
meaning of the words chosen by them to effect those purposes."
Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d
Cir. 1986) (internal quotations and citation omitted).  Where the
provisions of the policy "are clear and unambiguous, they must
be given their plain and ordinary meaning, and courts should
refrain from rewriting the agreement."   U.S. Fidelity & Guar.
Co. v. Annunziata, 492 N.E.2d 1206, 1207 (N.Y. 1986)
(internal quotations omitted).  The language of the contract
should be given meaning in the context of the instrument as a
whole, including any endorsements or riders, see Richner
Commc'ns, Inc. v. Tower Ins. Co. of N.Y., 898 N.Y.S.2d 615, 617
(N.Y. App. Div. 2d Dep't 2010), and the circumstances under which
the contract was executed, see Nemmer Furniture Co. v. Select
Furniture Co., 208 N.Y.S. 2d 51, 55 (N.Y. Sup. Ct. 1960).


III. APPLICATION

     The Policy provides, in relevant part, that a Pollution
Condition is created by the "discharge, dispersal, release,
seepage, migration, or escape" of a Pollutant, including fuel
oil, "into or upon land, or structures thereupon, the atmosphere,
or any watercourse or body of water . . .".  (Policy, §II, ¶R.)
     Plaintiff contends that it is entitled to coverage because

6

Tank 127 and the tank at the IP location into which Plaintiff
delivered contaminated oil are each in a Pollution Condition.
Both Pollution Conditions were created, according to Plaintiff,
by the "discharge" of contaminated oil.  Specifically, Plaintiff
alleges that contaminated fuel oil was "discharged" from P&W's
trucks into Tank 127, which Plaintiff asserts is a "structure"
upon land; that contaminated oil was then "discharged" from Tank
127 into delivery trucks; and that the trucks in turn
"discharged" the oil into IP's holding tanks.  Plaintiff's entire
argument thus turns on whether oil which is transferred from a
tanker truck into another containment vessel (or from a
containment vessel into a tanker truck) is "discharged" as that
term is used in the Policy even if no spill, leak, or other
accidental release occurs.  In support of its position, Plaintiff
cites dictionary definitions of "discharge" as meaning "to remove
or send forth"; "to pour forth [or] emit"; "[t]o unload or empty
contents"; "the act of removing a load"; and "[a]n instance of
pouring forth."

     It is well-established in New York that the terms of an
insurance contract must be read together to give their plain
meaning.  In light of that principle, the dictionary definitions
of "discharge" which include concepts of unloading or pouring
from one container into another cannot bear the weight Plaintiff
places on them.  Instead, when read together in the context of
the other terms with which it is placed in the Policy (e.g.,
"seepage", "migration", and "escape"), it is evident that a

"discharge" only creates a Pollution Condition when the pollutant discharged is in some way released from its confinement.  To hold otherwise would invite the absurd conclusion that a Pollution Condition exists any time any pollutant exists in any container of any kind, since — absent spontaneous generation — the pollutant must at some previous time have been unloaded from another vessel or poured forth into that container from elsewhere.  Thus, the only plausible reading of the Policy is that it provides coverage in the event that a pollutant is discharged from containment into land, structures, the atmosphere, or water, but not when, as here, the pollutant remains contained in vessels where it is intended to be kept and which were created for the very purpose of holding the pollutant until it is intentionally removed into a different container.

This reading gives full effect to Parties' probable intent when entering into the Policy.  Commercial general liability policies frequently exclude coverage for certain circumstances, including pollution.  For that reason, supplemental pollution coverage policies are available in order that an insured may obtain coverage for events for which coverage is not available under its primary policy.  The Policy here in question being such a supplemental policy, it is likely that Parties' intent in contracting was to obtain and to provide supplemental coverage for pollution events which would not be covered by most general liability policies.

The Court's reading of "discharge, dispersal, release,

8

seepage, migration, or escape" also conforms with the New York
Court of Appeals' construction of essentially identical language
when used in the context of a pollution exclusion in a general
liability policy.  Interpreting the meaning of an insurance
coverage exclusion which provided that there would be no coverage
in the event of the "discharge, dispersal, release, seepage,
migration, or escape" of a pollutant, the New York Court of
Appeals concluded that the exclusion was intended to apply only
when the pollutant escaped from containment. See Belt Painting
Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 377-78 (2003).  In light
of the fact that an exclusion to general liability which uses
that language applies only when the pollutant escapes
confinement, logic dictates that a supplemental pollution
coverage policy using the same language should be read to provide
coverage only in the event that a pollutant escapes confinement.
It is thus evident by its terms that the Policy provides coverage
only in the event that a pollutant escapes its confinement.

    Because no pollutant has escaped its confinement, the Court
concludes that no Pollution Condition exists under the facts and
circumstances alleged in the Complaint.  Accordingly, the Policy
does not cover Plaintiff's claims, and the Complaint must be
DISMISSED.


IV. CONCLUSION

    Defendant's Motion for Judgment on the Pleadings is GRANTED.
Plaintiff's Motion for Judgment on the Pleadings is DENIED.  The

Complaint is DISMISSED in its entirety and on the merits.  The
Clerk of Court is directed to enter judgment for Defendant and to
close the docket in this case.


SO ORDERED.


DATED:      New York, New York
            September 10 , 2012

                                        _Deborah A. Batts_

                                        Deborah A. Batts
                                    United States District Judge

10